**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| GUIDO "TREY" MERKENS,<br>        Plaintiff<br><br>v.<br><br><br>INVUITY INC. CHANGE IN<br>CONTROL AND SEVERANCE<br>PLAN,<br>        Defendant | §<br>§<br>§<br>§<br>§<br>§   **CIVIL ACTION NO.**<br>§   **5:20-cv-89**<br>§<br>§<br>§<br>§<br>§ |

## PLAINTIFF'S ORIGINAL COMPLAINT

The Administrator of the Invuity Inc. Change in Control and Severance Plan wrongfully denied severance benefits to Guido "Trey" Merkens.

### I. PARTIES

1. Plaintiff Trey Merkens is a resident of San Antonio, Bexar County, Texas.

2. The Invuity Inc. Change in Control and Severance Plan (Plan) is an employee benefit plan providing severance benefits to employees as a result of Stryker Corporation's acquisition of Invuity in October 2018. The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA). The Plan owes Plaintiff Trey Merkens severance

1

benefits. The Plan can be served with citation by serving the General Counsel of Invuity, Inc., 444 De Haro Street, San Francisco, CA 94107.

## II. JURISDICTION AND VENUE

3. This lawsuit is a claim for severance benefits provided by an ERISA welfare benefit plan brought under 29 U.S.C. §1132(a)(1)(B). This court has jurisdiction over this claim for severance benefits under 29 U.S.C. §1132(e)(1) of ERISA. Venue is proper in the Western District of Texas, San Antonio Division, in accordance with 29 U.S.C. §1132(e)(2) as the severance benefit payment obligations under the Plan are to Merkens at his home in San Antonio, Texas.

## III. STATEMENT OF FACTS

4. Merkens worked for Invuity Inc. in Austin, Texas. Invuity is a medical technology company that makes advanced lighting products to aid surgeons during surgical procedures. Merkens was an accomplished salesman for Invuity, earning $228,547.40 in 2017 and $295,319.11 in 2018. Merkens is married and has three children.

5. Stryker Corporation makes a broad array of medical equipment and implants used for joint replacements. Stryker acquired Invuity in October of 2018. When Stryker acquired Invuity, Merkens became eligible to participate in the Plan. The Plan was designed to provide severance benefits for Invuity employees who either lost their jobs as a result of the acquisition or voluntarily terminated their employment for "Good Reason" as that term was defined by the Plan. Merkens' severance benefit was set forth in a Form of Participation Agreement,

attached to the Plan he received and signed by Merkens and the CEO of Invuity. His severance benefit was a lump sum payment of $56,250 less applicable withholdings.

6. After the acquisition, Merkens was offered employment with Stryker as Area Sales Manager for the San Antonio-Southwest territory. He was one of only five Invuity sales representatives asked by Stryker to stay on and join Stryker's surgical safety division. His work would begin on January 1, 2019 and he would have to relocate from Austin to San Antonio. He was told by Stryker that he was projected to make $224,000 based upon the existing San Antonio business and his commission structure. Stryker made this representation in writing so that Merkens could use it to qualify for a mortgage so that he could relocate to San Antonio with his family. Merkens declined other job prospects and accepted Stryker's offer, relying upon Stryker's representations regarding his projected earnings for 2019.

7. Based upon Stryker's letter that he was projected to make $224,000 in 2019, Merkens pre-qualified for his mortgage in San Antonio.

8. Merkens received his sales quota and sales goals for his 2019 territory from Stryker when be began his employment with Stryker in January 2019, after he had trained Stryker's sales force on Invuity products at Stryker's National Sales Meeting.

9. Merkens began work with Stryker on January 1, 2019 and by the second or third week in January, 2019 he realized that he would not earn close to what Stryker represented. This was based upon his review of the sales quotas and sales

goals that he received in January of 2019 as well as his earnings up to that point. His position with Stryker was a commission only position. He added up all of the expected sales or goals given to him and even at the highest commission rate of 6.7% for base business at 100% quota achievement, an unrealistic scenario, along with possible bonuses, he was still $40,000 to $50,000 below what Stryker had promised him (and his mortgage company): earnings of $224,000 per year. Also, this calculation based upon a 100% quota achievement was still over $100,000 less than his earnings the prior year when working for Invuity.

10. He told his manager Katie Marrs that it was becoming clear to him that he would not be able to approach the compensation that Stryker promised him. In January 2019 Merkens earned $5,500; in February he earned $13,222.23; in March he earned $7,053.34. Merkens advised Marrs that he was buying a house in San Antonio and, based upon his actual earnings with Stryker and realistic projections based upon the sales goals and quota he was provided in January he could not afford to move his family to San Antonio. Merkens' mortgage broker told Merkens that due to his income statements from Stryker his financing was in jeopardy, as his actual income was substantially lower than the annual projected income of $224,000 provided by Stryker.

11. Marrs and others within Stryker management, including Greg Siller, VP of US sales, responded to Merkens' complaints by telling him that his earnings would improve. Siller offered Merkens a guaranty of $160,000 per year in

compensation. This was still $64,000 below the pre-employment representations made by Stryker. Merkens refused the offer.

12. Once it became clear to him that he would not earn close to the compensation that Stryker represented that he would earn, and that Stryker was not willing to guaranty Merkens a salary of $224,000, Merkens resigned and took another job. He had no other choice. There was no way he could pay the mortgage that he had pre-qualified for and meet his other expenses and financial goals with the compensation being paid or being offered by Stryker.

13. On or about March 28, 2019, while still employed by Stryker but transitioning to work for another employer, Merkens requested his severance benefit from the Plan because of the material reduction in his cash compensation and his inability to relocate while employed by Stryker due to that reduced compensation.

14. On March 28, 2019, Stacie Ferschweiler, Senior Director of Human Resources with Stryker, indicated via email that Merkens was not entitled to severance benefits because he did not meet the time requirements of the Good Reason provision within the Plan. She indicated that the Good Reason provision requires that the claimant provide notice of the grounds for his or her resignation within 90 days of the initial existence of those grounds. She maintained that the 90-day requirement commenced on or about November 25, 2018, when Merkens signed his employment offer letter, and therefore he was required to give notice of the reduction in his compensation within 90 days of November 25, 2018.

5

15.  Section 2.14 , the "Good Reason" provision, is as follows:

"2.14  "Good Reason" means the Eligible Employee's resignation within thirty (30) days following the expiration of any Company (Invuity) cure period (discussed below) following the occurrence of one or more of the following without the Eligible Employee's express written consent: (i) a material reduction in job duties, responsibilities and requirements inconsistent with the Eligible Employee's position with the Company and the Eligible Employee's prior duties, responsibilities and requirements in effect prior to such reduction, provided, however that neither a change in the identity, title or role of the person to whom the Eligible Employee reports, not a change in duties, responsibilities and requirements that results from the growth of the Company will constitute Good Reason; (ii) a material reduction of the employee's total cash compensation; or (iii) the Eligible Employee's refusal to relocate the principal place for performance of Company duties to a location more than fifty (50) miles from the Company's then-present location.  The Eligible Employee's resignation will not be deemed to be for Good Reason unless the Eligible Employee has first provided the Company with written notice of the acts or omissions constituting the grounds for "Good Reason" within ninety (90) days of the initial existence of the grounds for "Good Reason" and a reasonable cure period of not less than thirty (30) days following the date the Company receives such notice, and such condition has not been cured during such period."

16.  In addition to contending that Merkens did not provide notice of the grounds for his resignation within 90 days of the initial existence of those grounds, Ferschweiler indicated that Merkens did not satisfy the Good Reason provision for severance benefits because he did not give thirty (30) days notice and allow Stryker a right to cure during that period.

17.  Although Merkens had given Stryker ample notice of his complaints due to the material reduction in his compensation, i.e. he had satisfied the notice and cure period of the Good Reason provision, he offered to stay on for additional time so that Stryker would deem that he met the notice and cure period.

6

18. Fershweiler declined his offer to stay, telling Merkens that Stryker's position stands, i.e. that there would be no use for Merkens to stay on with Stryker to satisfy Stryker's measurement of the notice and cure period because he was "not eligible for severance benefits…..based on not meeting the Good Reason requirement."

19. On May 30, 2019, through the undersigned counsel, Merkens submitted a formal claim for benefits to the Administrator of the Plan.  He provided proof of the material reduction of his compensation that resulted from Stryker's acquisition of Invuity and the position that he accepted with Stryker, satisfying the second prong of the Good Reason requirement.

20. Steve Rann, Vice President of Stryker, notified Merkens on behalf of the Plan Administration Committee that his claim for severance benefits was denied.  Rann gave two reasons for denial:  1) Merkens resigned too early, only two months after working for Stryker, making it impossible to calculate whether or not he was experiencing a material reduction in his cash compensation that would have met the Good Reason requirement (the implication being that his compensation might have significantly increased subsequent to his resignation),[1] and 2) Merkens resigned too late, since, according to the Committee, he had full knowledge of the compensation he would receive with his new job with Stryker by November 26, 2018, and he did not submit his written resignation until March 18,

---

[1] Merkens actually worked for Stryker for 77 days, from January 1, 2019 until March 18, 2019.

2019, almost four (4) months later, not within the ninety (90) days required by the Good Reason provision within the Plan.

21. Merkens timely appealed. He argued that there was no waiting requirement within the "material reduction in compensation" prong of the Good Reason provision. By asserting that Merkens didn't work long enough for a determination to be made as to whether or not his compensation would be materially reduced, the Plan administrators added conditional language to the Good Reason provision of the Plan that was not there.

22. Merkens also argued that the first reason for denial was based upon speculation (wishful thinking) rather than real evidence. Mr. Rann, on behalf of the Plan Administration Committee, stated as follows:

> "…It is the Company's position that you would have met or exceeded your total cash compensation target had you remained in your role through the end of 2019."

23. Merkens argued in his appeal that the Committee's position that Merkens would have met or exceeded his "total cash compensation target" had no factual foundation. According to the quota and sales territory that were provided to Merkens when he began work in January 2019, it became clear to Merkens only after the inception of his employment that he would not earn the compensation that was represented to him in Stryker's pre-employment letter

24. In addition, Merkens stressed that the Administrator's analysis of a "reduction in cash compensation" was flawed. The adverse benefit determination

speculated that had Merkens stayed with Stryker in 2019, he might have "met or exceeded his total cash compensation target." A "cash compensation target" is not the Plan's measure of whether or not Good Reason exists for an employee's resignation. According to the Plan, Good Reason exists when there is a material reduction in the employee's total cash compensation. The proper measure of whether or not Merkens experienced a material reduction in his total cash compensation is comparing what he earned in 2018 while working for Invuity to his earnings with Stryker in 2019. Merkens provided ample evidence of the material reduction in his compensation as a result of Stryker's acquisition of his prior employer, Invuity.

25. Also, Merkens pointed out in his appeal that the second reason given for denial contradicted the first reason. The first reason contended that Merkens reported a material reduction in cash compensation too early, i.e. that he needed to work the entire year before a material reduction in cash compensation could properly be measured and therefore reported. The second reason contended that Merkens reported a material reduction in cash compensation too late, i.e. that he should have reported it within 90 days of November 26, 2018, when, according to the Committee, he had full knowledge of the compensation that he would be receiving from Stryker in 2019. Merkens pointed out that this calculation of days by the Administrator was error, as he did not receive his sales quota and territory until after he began his employment with Stryker after January 1, 2019. There was

no way for him to reasonably calculate his compensation for 2019 in November or December of 2018.

26. Also, in his appeal Merkens argued that in addition to meeting the second prong of the Plan's Good Reason requirement-the material reduction in cash compensation-he met the third prong of the Good Reason provision-refusal to relocate to a distance over 50 miles away- as he refused to relocate from Austin to San Antonio, as requested by Stryker, a distance of over 50 miles, because he could not afford the house he was trying to finance, along with his other monthly expenses, with the compensation he was receiving from Stryker.

27. In spite of these arguments, Administrator Rann denied his appeal by letter dated December 12, 2019. He denied Merkens' appeal regarding the second prong of the Good Reason provision for the same reasons that Merkens' initial claim was denied. He denied Merkens' appeal under the third prong of the Good Reason provision by stating that Merkens' acceptance of Stryker's offer letter on November 25, 2018 eliminated "any subsequent right to resign for Good Reason due to relocation."

28. Merkens was advised by Administrator Rann in the December 12, 2019 letter that the Plan Administrator's decision was final and that Merkens had a right to bring an action under Section 502(a) of ERISA.

## IV.  CAUSE OF ACTION UNDER ERISA

### Exhaustion of Appeal Requirements

29.  Merkens exhausted his appeal rights as required by the Plan and ERISA claims regulations.

### The Final Denial Was Contrary to a Preponderance of the Evidence, or, in the Alternative, Was an Abuse of Discretion

30. If the standard of review of the Plan Administrator's decision is determined to be de novo, the default standard of review for ERISA benefit denials, then the decision to deny Merkens' severance benefits is contrary to the preponderance of the evidence.  If the Plan Administrator is found to have been granted proper discretionary authority by the Plan that allows for an abuse of discretion standard of review, the Plan Administrator's decision to deny severance benefits to Merkens was an abuse of that discretion.

31. The Plan Administrator's final decision was an abuse of discretion because it is contrary to the plain language of the Plan.  Merkens had Good Reason to terminate his employment with Stryker because he experienced a substantial reduction in his cash compensation and timely reported that reduction.  Also, he gave Stryker more than thirty days to cure that reduction.  Merkens also had Good Reason to terminate his employment with Stryker because, based upon the material reduction in his compensation, he refused to relocate to a distance over 50 miles away. Although he initially agreed to take the job and relocate based upon Stryker's representation that he could expect to earn $224,000 in 2019, his

11

final decision was to refuse to relocate from Austin to San Antonio with the compensation he was receiving from Stryker, as his compensation did not approach what Stryker represented it would be in its pre-employment letter and he could not afford to move his family and pay the mortgage and other expenses with the compensation he was receiving from Stryker.

**Claim for Severance Benefits Under the Plan**

32.  Merkens seeks to recover severance benefits due his under the Plan under the authority of 29 U.S.C. §1132(a)(1)(B) of ERISA.   The Plan owes him $56,250 in severance benefits.

## V.  RELIEF REQUESTED

33. Merkens requests an order by this Court declaring that he is entitled to severance benefits under the Plan and an award of severance benefits in the amount of $56,250.

## VI.  ATTORNEY'S FEES

34.  Merkens requests his attorney's fees and costs under 29 U.S.C.A. 1132(g) and also under Section 15 of the Plan, which allows for recovery of attorney's fees to a Plan participant who prevails on at least one material issue of his or her claim.

## CONCLUSION

Merkens requests an order by this Court declaring that he is entitled to severance benefits under the Plan and an award of severance benefits in the amount of $56,250.  He also requests his attorney's fees, pre-judgment interest at

the maximum rate allowed by law, post-judgment interest, and for such other and further relief, both at law and in equity, to which he may show himself to be justly entitled.

Respectfully Submitted,

**Law Office of Jeffrey E. Dahl**
The Travis Building
405 N. St. Mary's Street, Suite 242
San Antonio, Texas  78205
(210) 527-0900 (Telephone)
(210) 527-0901 (Facsimile)
jdahl@erisaattorneyintexas.com

By*:   /s/ Jeffrey E. Dahl*
**Jeffrey E. Dahl**
**State Bar No. 05310900**
**Attorney for Plaintiff Guido "Trey" Merkens**